IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LARRY D. KELLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:13cv649-SRW |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Larry D. Kelley brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## BACKGROUND[1]

Plaintiff filed the present applications for benefits on December 16, 2010 (with a protective filing date of December 2, 2010) alleging disability since August 15, 2008 – when he was approaching his 27th birthday – due to a shoulder injury that causes his shoulder to dislocate if he reaches out "too far" or overhead.  (R. 132-39, 165, 170, 191, 341).[2,3]  In his function report, plaintiff checked only two boxes to indicate the functions affected by his condition – lifting and reaching.  (R. 191).  The state agency sent plaintiff to Dr. Dimtcho

---

[1] Plaintiff's allegations of error relate to the ALJ's assessment of his mental limitations. The court limits its discussion of the record accordingly.

[2] However, plaintiff also reported that he stopped working on that date because he "got laid off," not because of his impairment.  (R. 170).

[3] Plaintiff has a limited work history at a textile mill, at a fast food restaurant, and as a construction laborer (see R. 178, 194); the VE testified and the ALJ found that plaintiff has no past relevant work.  (R. 56, 27).

2

Popov for a consultative physical examination (see Exhibit 4F, 2/16/11 CE report) and, thereafter, Dr. Heilpern – a non-examining state agency physician – reviewed plaintiff's file. Dr. Heilpern concluded – giving significant weight to Dr. Popov's report – that plaintiff is capable of performing the exertional requirements of "light" work, with a limitation to no overhead reaching with the right arm (see Exhibit 5F, Dr. Heilpern's 2/18/11 physical RFC assessment; 20 C.F.R. § 404.1567(b)(physical exertion requirements of light work)).

On December 1, 2010, just before he filed the present claims for disability, plaintiff called East Alabama Mental Health ("EAMH"). The "initial contact" note reads, "Caller reports mood disturbance, has a bad attitude. Cannot sleep at night. Has upsetting dreams. Wakes up in sweats." The staff member who took the call gave plaintiff an appointment to see Kathie Roper Ericson on January 25, 2011 for an intake evaluation. (R. 387). Licensed Professional Counselor Ericson evaluated the plaintiff on March 1, 2011, two weeks after his consultative examination with Dr. Popov. (R. 393, 394-97). Ericson's note for the intake evaluation reflects plaintiff's report of a head injury in 1993 in which he suffered a "cracked skull" and was in a "coma for 1½ months."[4] (R. 394). She notes, "attitude change – temper, acting out" at age 16-17, nightmares, "3-4 hrs per sleep, waking up in a sweat[,]" "vague suicidal/homicidal thoughts without plan or intent[,]"[5] "vague [visual] hallucinations – sees

---

[4] Exhibit 6F is the discharge summary from plaintiff's 1994 hospitalization for the head injury; it reflects that plaintiff was discharged home after sixteen days. (R. 355-56).

[5] Ericson wrote, "Reports vague thoughts of hurting self or others from time to time without plan or intent. Denied today – Signed written no harm agreement." (R. 395; see also R. 386).

shadows at night[,]" and his self-report of a sustained emotions of depression and anger. (R. 394-95). Ericson noted that plaintiff was applying for disability and was represented by attorney Faye Edmondson, that he "smokes pot" every day and "marijuana calms him down[,]" and that he worked at Taco Bell in 2008 but "lost" that job "because of attitude[.]" (R. 394). On mental status examination, Ericson observed that plaintiff's affect was labile, constricted, and depressed; she noted no other abnormalities. (R. 394).

> Ericson summarized the intake interview as follows:
>
> Consumer is a 29 yr old African American single male who has history of head injury, cracked skull, at age 11 (1½ months in coma). Reports [illegible] anger, acting out, unable to keep job due to attitude, jail for temper problems. Reports depression, night sweats, nightmares, sees shadows at night. Reports daily marijuana us that helps control [illegible] temper. Thoughts of hurting self and others from time to time without plan or intent. Signed written no harm agreement.

(R. 388). In plaintiff's treatment plan, Ericson recorded plaintiff's "Long-Term Vision" as "Get Disability; Help w/ Mental Health Symptoms[.]" (R. 390). She assessed a need for weekly group counseling and monthly individual counseling, medication management and assessment by a physician. (R. 392). Psychiatrist Heather Rowe signed the treatment plan on March 25, 2011, approving diagnoses of: (1) Mood Disorder, NOS; (2) Intermittent Explosive Disorder; (3) Marijuana Abuse; and (4) Rule out Personality Disorder NOS. (R. 389, 393).

The next mental health treatment note of record is for plaintiff's visit to Dr. Robert Schuster on August 17, 2011 – five months after the initial evaluation. Plaintiff was not yet

on medication. He reported interrupted sleep and occasional "voices" and visual hallucinations, no alcohol or drug use or suicidal/homicidal ideation, and "OK" mood and appetite. Dr. Schuster prescribed Zyprexa – an antipsychotic medication[6] – at a dosage of 5 mg at bedtime, and gave plaintiff a sample of 14 pills. (R. 385, 398).

On September 14, 2011, plaintiff saw therapist Ericson. She noted, "Met w/ consumer. Decrease in visual hallucinations. Worked on anger management. Recommend GPT [group therapy]. Clean + sober from marijuana for 1 month. Went over parenting issue. Sleeping OK. Meds are helping. Appears stable on meds[.]" (R. 384). The same day, plaintiff also saw Dr. Schuster. Plaintiff reported a decrease in mood swings, improved sleep, and that he had been out of medications for three weeks. Dr. Schuster noted "OK" mood and appetite, no "voices" or suicidal/homicidal ideation, and "Sleep better[.]" He increased plaintiff's dosage of Zyprexa to 7.5 mg. (R. 383). On that date, plaintiff's treatment plan was amended to add a diagnosis of "Psychotic Disorder, NOS[.]" (R. 389).

Plaintiff next sought treatment at EAMH on February 1, 2012. He told therapist Lucy Lawrence that he had run out of medication one month earlier, that he had been "locked up in Dec[ember] for an old fine[,]" and that he "waits for Disability[.]" He agreed "to attempt therapy[.]" (R. 382). Dr. Schuster evaluated plaintiff that same day. He noted that plaintiff was "out of meds[,]" that his mood was better, and mood and sleep were both "fine[.]" Dr. Schuster again prescribed Zyprexa, 7.5 mg. (R. 381)

---

[6] See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html (MedlinePlus webpage of the National Institutes of Health, accessed August 1, 2014).

Ericson saw plaintiff on February 23, 2012 for Anger Management group therapy. She noted "No evidence of overt psychoses[.]" (R. 380). Plaintiff returned to see Dr. Schuster on February 29, 2012. Plaintiff told the intake nurse that he was hearing voices every day and "feels like hurting others sometimes[.]" The nurse noted his affect/mood as "depressed." (R. 379). Plaintiff told Dr. Schuster that his mood was a "little worse[.]" Dr. Schuster noted "now tremors[,]" "anxious[,]" "sleep fine at times[,]" no suicidal or homicidal ideation, and "voices no better + visual hallucinations[.]" (Id.). Dr. Schuster increased plaintiff's Zyprexa dosage to 10 mg and added a prescription for Hydroxyzine, 25 mg. (R. 398).

On the same day, Dr. Schuster completed a medical source statement assessing moderate and marked limitations in work-related mental functions. In the paragraph of the form directed to concentration and persistence, Dr. Schuster assessed "marked" limitations in plaintiff's ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; and (4) work in coordination with or proximity to others without being distracted by them.[7] Asked to "[i]dentify the factors ... that support [his] assessment[,]" Dr. Schuster responded "Head injury 1992[.]" He concluded that plaintiff is likely to be absent from work more than four

---

[7] These four work-related functions are identified within paragraph three of the MSS form. Dr. Schuster assessed marked limitations in ten other functions listed in paragraphs 1 and 2 of the form.

days per month as a result of his impairments and/or treatment. (Exhibit 8F, R. 360-62).[8]

At his next visit with Dr. Schuster, on April 11, 2012, plaintiff reported that he had run out of Zyprexa. Dr. Schuster noted "voices little worse[.]" He increased plaintiff's Zyprexa dosage to 20 mg, continued him on the Hydroxyzine, and scheduled him to return in three months. (R. 378, 398). The administrative transcript includes no record of plaintiff's treatment at EAMH thereafter.

## DISCUSSION

The ALJ found the plaintiff to suffer from the "severe" impairments of "Hill-Sachs deformity - right shoulder; depression; mood disorder, NOS; intermittent explosive disorder; marijuana abuse; personality disorder, NOS; gouty arthritis; status post head injury; and obesity[.]" (R. 14). The mental limitations assessed by the ALJ are as follows:

> He can interact/respond appropriately with supervisors, but this should be casual and non-confrontational. He can interact/respond appropriately with co-workers, but this should be casual and non-confrontational. He can interact-respond appropriately to customers/general public, but this should be casual and non-confrontational. He can respond appropriately to work pressures in usual work setting and to changes in routine work setting. He can use judgment in simple 1-2 step work-related decisions but cannot use judgment in detailed on complex work-related decisions. He can understand, remember, and carry out simple 1-2 step instructions but cannot understand, remember, and carry out detailed or complex instructions.

(R. 17). The ALJ concluded, based on the testimony of a vocational expert, that these mental limitations did not preclude plaintiff from performing the requirements of jobs that exist in

---

[8] The form defines "Moderate" as "more than a slight limitation in this area but the individual is still able to function satisfactorily" and "Marked" as "serious limitation in this area ... a substantial loss in the ability to effectively function." (R. 360).

significant numbers in the national economy and, thus, that plaintiff was not under a disability from his alleged onset date through the date of the decision. (R. 28-29). Plaintiff contends that the ALJ erred in reaching his decision by: (1) failing to obtain the opinion of a qualified psychiatrist or psychologist before denying plaintiff's claim; (2)"acting as both Judge and mental health professional[;]" and (3) rejecting the opinions expressed by plaintiff's treating psychiatrist, Dr. Schuster. (Plaintiff's brief, p. 4).

"[T]he testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)(citations omitted). The ALJ assigned "little weight" to the opinions expressed by Dr. Schuster in the Medical Source Statement form at Exhibit 8F; the ALJ states that he did so because "there is nothing in his treating notes in Exhibit 12F to show that the claimant's mental abilities are this limited. His opinion is not supported by his own clinical examinations and testing. Dr. Schuster did not note any difficulty [with] mental limitations related to work activity." (R. 27). At R. 24-25, the ALJ further analyzes the EAMH treatment record, including plaintiff's reports of his mood as "fair" or "okay," improvement in his mood swings, that medications were helping, and of being out of medications. An ALJ "is free to reject the opinion of any physician when the evidence supports a contrary conclusion" (Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)) and "... there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," so long as the ALJ's decision allows the court to conclude that the ALJ

considered the plaintiff's condition as a whole (Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). However, upon consideration of the ALJ's analysis and the evidence of record, the court concludes that the reasons given by the ALJ do not constitute "good cause" for his rejection of Dr. Schuster's opinion.

As plaintiff points out (Plaintiff's brief, p. 5), Dr. Schuster's diagnoses included Psychotic Disorder, not otherwise specified. See R. 389 (9/14/11 notation adding diagnosis of "Psychotic Disorder, NOS" with diagnostic code 298.9). Dr. Schuster's diagnosis is a "medical opinion" as defined in the Commissioner's regulations. See 20 C.F.R. § 404.1527(a)(2). While the ALJ credited the mental health impairments diagnosed at EAMH upon initial evaluation (*compare* diagnoses at R. 389 with ALJ's step-two conclusions at R. 14-15), he does not mention Dr. Schuster's diagnosis of psychotic disorder at any point in his decision. Thus, the ALJ neither acknowledges Dr. Schuster's diagnosis nor gives any reason for rejecting it. The ALJ clearly erred in this regard. See Luckey v. Astrue, 331 F. App'x. 634, 639 (11th Cir. 2009)("Most alarmingly, the ALJ omits Graham's ultimate diagnosis altogether – '[p]robable anti-social personality disorder.' Without a more specific statement of the ALJ's considerations, we are unable to discharge our duty to scrutinize the record in order to determine whether the ALJ's severe impairment findings are rational and supported by substantial evidence.")(alteration in original; citations omitted).

Dr. Schuster also identifies plaintiff's "Head injury 1992" as supporting his assessment of plaintiff's functional limitations. (R. 362). While the ALJ acknowledges this

9

statement in his summary of the evidence (see R. 22), the ALJ's conclusion that plaintiff has "had no significant treatment since 1994" for his severe impairment of "status post head injury" and "has not required any recent follow up with a doctor or specialist with regard to status post head injury" suggests that the ALJ also rejected Dr. Schuster's medical opinion that plaintiff's mental symptoms and limitations relate to plaintiff's remote closed head injury, as the ALJ's analysis makes clear that he does not consider plaintiff's treatment at EAMH to qualify as "recent follow up with a doctor or specialist with regard to status post head injury." Despite Dr. Schuster's opinion that plaintiff's head injury supports his assessment of plaintiff's mental limitations, the ALJ assumes (without explaining how he reached this conclusion) that plaintiff's psychiatric treatment by Dr. Schuster was not "with regard to status post head injury." Thus, the ALJ's decision does not provide the court with sufficient reasoning to permit the court to conclude that the ALJ evaluated Dr. Schuster's medical opinions as to plaintiff's work-related mental limitations in light of either plaintiff's diagnosis of psychotic disorder or the potential effects of plaintiff's closed head injury on such work-related functions as plaintiff's ability to interact appropriately with others in a work setting or his ability to maintain concentration and persistence.[9]

---

[9] In finding the plaintiff's impairment of "status post head injury" to be "non-disabling," the ALJ further notes that "the claimant appears to have adequate functioning as he took the oral test for his driver's license and he had a driver's license until it was suspended two years ago. He has hobbies of playing dominoes and cards. He sits with his grandmother who is not in good health to keep her company." (R. 26). The significance of the ALJ's observation that plaintiff is able to sit with his grandmother to keep her company is not clear to the court. However, the other observations suggest that the ALJ understands the potential effects of a head injury to include cognitive deficits. The activities noted by the ALJ with regard to plaintiff's head injury do not impeach Dr. Schuster's

Plaintiff further contends that, since the ALJ rejected Dr. Schuster's opinion and the record includes no other opinion from a mental health professional regarding plaintiff's mental limitations, the ALJ's decision denying plaintiff's claims is not supported by substantial evidence. (Plaintiff's brief, pp. 4-9). The Commissioner points out that "[t]he ALJ – not a psychologist or physician – is responsible for assessing a claimant's residual functional capacity" and that "residual functional capacity assessments ***must be based on all relevant evidence in the record," not just the medical evidence.***" (Commissioner's brief, p. 10)(citations omitted; emphasis in original). The Commissioner further notes that the Eleventh Circuit and courts within this district have concluded that "there is no requirement that an ALJ's finding be based on the residual functional capacity assessment of a physician in every case." (Id.). The general legal premises advanced by the Commissioner are correct. However, when applied to the particular decision and record before the court, they provide little support for the Commissioner's position. As the Commissioner argues, the ALJ's RFC finding must be based on all relevant evidence in the record; however, the ALJ's decision in the present case does not reflect that he considered all of the probative evidence. Additionally, neither the regulations assigning responsibility for determining RFC to the ALJ nor the case law holding that an ALJ may do so without a functional capacity assessment by a physician overcomes the overarching principle that the ALJ's decision must be supported

---

opinions regarding plaintiff's ability to interact with others and respond appropriately to them in a work setting or to sustain concentration and persistence directly, and the ALJ does not point to these activities as supporting his rejection of Dr. Schuster's medical opinions.

by substantial evidence. The Eleventh Circuit's analyses in the opinions cited by the Commissioner reveal this to be so. In Green v. Soc. Sec. Admin., 223 F. App'x. 915 (11th Cir. 2007), the court reasons:

> Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record lacked substantial evidence to support a finding that she could perform light work. *Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work.* Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of [] Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work.

Id. at 923-24 (emphasis added). In Castle v. Colvin, 557 F. App'x. 849 (11th Cir. 2014), a Title II case, the limitations at issue were related to plaintiff's claim of severe knee pain. The claimant alleged disability as of January 1, 2008 and was insured through March 31, 2009. The record included evidence that: he had been released to work with no restrictions by his surgeon in April 2000, after a knee arthroscopy in October 1998; that he had sought no treatment at all for problems with his knee between 2001 and 2009; that, in 2007 and 2008, he had denied musculoskeletal problems in his visits to his primary care physician and had a normal station and gait; and he participated in significant activities of daily living. The Eleventh Circuit concluded that, despite the ALJ's rejection of the only medical opinion of record regarding the claimant's limitations, the ALJ's RFC finding for less than a full range of medium work was supported by substantial evidence. The Eleventh Circuit found the

district court's reliance on Manso-Pizarro v. Sec. of Health and Human Services, 76 F.3d 15 (1st Cir. 1996) for its conclusion that "an ALJ is not qualified to interpret raw data in a medical record" to have been "misplaced." Castle, 557 F. App'x. at 854.  The Eleventh Circuit reasoned that Castle's case fell "within the exception articulated by the First Circuit" – *i.e.*, that "'[w]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment[]'" – and concluded that "Mr. Castle's lack of medical treatment for his knees during the relevant period does not demand review by a medical professional." Id. (quoting Manso-Pizarro, 76 F.3d at 17).  The court further observed that "the ALJ appropriately considered all of the evidence Mr. Castle proffered in support of his claim of disability[.]" Id.

    Even assuming that the ALJ rejected Dr. Schuster's opinion properly, the record in the present case is unlike that in Green, in which the court noted the absence of any evidence refuting the claimant's ability to perform light work other than the rejected medical opinion and the claimant's testimony, or that in Castle, in which the claimant had sought no treatment at all during the relevant period for symptoms relating to the impairment at issue.  In this case, the plaintiff's treatment at EAMH for his mental health problems falls within the relevant period.  Additionally, plaintiff submitted into evidence the written statement of Keona Marbury, plaintiff's supervisor at Taco Bell, in support of his claim of disability. Marbury observes, among other things, that plaintiff "required constant supervision" and was

13

"unable to concentrate on one responsibility for more than 1 hour at a time." (Exhibit 15E, R. 234). Marbury's statement was before the ALJ when he rendered his decision. (See Exhibit 15E and R. 53-54). However, the ALJ does not mention it, and Marbury's statement – Exhibit 15E – is not included in the exhibit list appended to the ALJ's decision. (See R. 32 (listing "E" exhibits through 14E only); see also R. 4 (Appeals Council's exhibit list identifying Exhibit 16E only)). Thus, the ALJ's decision does not reflect that he considered Marbury's statement in resolving plaintiff's claims.[10]

The Green holding is not on point, given the existence in this case of other probative evidence of record regarding plaintiff's work-related mental limitations – *i.e.*, his former supervisor's statement regarding plaintiff's need for "constant" supervision and inability to sustain concentration for more than an hour at a time. The present case also differs significantly from that before the Eleventh Circuit in Castle, in view of the ALJ's failure to consider "all of the evidence [plaintiff] proffered in support of his claim of disability" and plaintiff's record of treatment during the relevant period for mental health impairments that are beyond the realm of "commonsense judgment about functional capacity[.]'" Castle, 557 F. App'x. at 854)(citation omitted); see also Luckey, 331 F. App'x. at 639; Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)(finding error in the ALJ's failure to "make

---

[10] Plaintiff does not allege error in the ALJ's failure to consider the supervisor's statement specifically. However, in view of the Eleventh Circuit's analyses in Castle and Green, the ALJ's failure to consider Marbury's observations of plaintiff's mental limitations in a work setting bears on the issue argued by the plaintiff – *i.e.*, whether the ALJ's decision as to his mental limitations is supported by substantial evidence without the opinion of a mental health professional.

clear the weight accorded to the various testimony considered" and stating, "'Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."'")(citation omitted).

In the present case, the need for opinion evidence as to plaintiff's mental limitations is demonstrated by a comparison of the ALJ's step three analysis with his RFC finding. In step three of the sequential analysis, the ALJ concludes that plaintiff has "moderate difficulties" with regard to concentration, persistence or pace. (R. 16). The only limitations within the ALJ's RFC that arguably relate to these moderate difficulties are the limitations to understanding, remembering and carrying out "simple 1-2 step instructions" and using judgment in "simple 1-2 step work-related decisions[.]" (R. 17). However, without medical evidence that plaintiff remains capable of performing such "simple 1-2 step" work on a sufficiently sustained basis *despite* his moderate limitations in concentration, persistence, or pace, the ALJ's RFC limitation to "simple 1-2 step" work does not account for plaintiff's difficulties in maintaining concentration, persistence, or pace. Cf. Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)(noting, with approval, that "[o]ther circuits have also rejected the argument than an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. ... But when medical evidence demonstrates that a

claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficient accounts for such limitations."); Richter v. Commissioner of Soc. Sec., 379 F. App'x. 959, 962 (11th Cir. 2010)("[W]e conclude that the ALJ's failure to include all of Richter's impairments in his hypothetical question was error. This error was not harmless because the inquiry conducted by the vocational expert did not implicitly account for Richter's deficiencies in concentration, persistence, and pace. Additionally, there is no medical evidence that, despite these limitations, Richter nevertheless retained the ability to perform simple, repetitive, and routine tasks or unskilled labor."); 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.00(C)(3)("*Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.")(italics in original); SSR 96-8p ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."); Walker v. Astrue, 2010 WL 4226485, *6 (M.D. Ala. Oct. 21, 2010)(rejecting the Commissioner's argument that a limitation to unskilled work accounts for a moderate limitation in concentration, persistence or pace); see also Hines-Sharp v. Commissioner of Soc. Sec., 511 F. App'x. 913, 916 (11th Cir. 2013)(in a case in which the ALJ's PRT finding was "expressly and exclusively based" on the "more specific findings" in a psychologist's report, finding no error in the ALJ's inclusion of the "more specific findings" in the

hypothetical question posed to the vocational expert, instead of the ALJ's PRT finding of marked limitations in concentration, persistence, and pace). The ALJ does not cite the medical evidence on which he relied in formulating the mental limitations he included in his RFC finding, and the court has found no medical opinion of record indicating that plaintiff remains able to sustain concentration, persistence, and pace sufficiently to perform "simple 1-2 -step" work.

In this regard, the court cannot agree with the Commissioner's contention (see Commissioner's brief, p. 7) that the opinion of consultative *physical* examiner Dr. Popov that plaintiff "can find employment despite his impairment" and the assessment of non-examining state agency physician Heilpern that plaintiff can perform the *physical* requirements of light work, with postural and manipulative limitations, suffice on this point. First, the court notes that the Commissioner misstates the opinions rendered by Drs. Popov and Heilpern to better support her argument. The Commissioner modifies Dr. Popov's opinion by indicating that it relates to plaintiff's ability to work despite his "impairments" (plural). (Commissioner's brief, p. 7)("[D]r. Popov opined that Plaintiff can still find employment despite his impairments")(citing R. 342)(emphasis added). However, Dr. Popov's opinion actually relates to plaintiff's ability to find work despite his "impairment" (singular), and Dr. Popov's report makes clear that he refers to the impairment (singular) that he diagnosed, *i.e.*, "719.48 - Pain in join, other specified sites - Status: chronic uncontrolled[.]" (R. 344). The Commissioner also suggests that Dr. Popov's review of symptoms "resulted in relatively

17

normal benign *findings (including psychiatric)*." (Commissioner's brief, p. 3)(emphasis added). While Dr. Popov's report includes plaintiff's "self report[]" denying various psychiatric symptoms (R. 341, 342), Dr. Popov makes no "findings" about plaintiff's psychiatric impairments or status and he offers no opinion about plaintiff's mental limitations. (Exhibit 4F). The Commissioner also overstates Dr. Heilpern's opinion; she argues that "Dr. Heilpern[] opined that Plaintiff could do a range of unskilled light exertion work." (Commissioner's brief, p. 7 )(emphasis added). However, nothing in the "Physical Residual Functional Capacity Assessment" form completed by Dr. Heilpern addresses plaintiff's mental limitations; Dr. Heilpern certainly renders no opinion that plaintiff remains capable of performing the mental requirements of unskilled work despite his moderate difficulties in concentration, persistence, and pace. (See Exhibit 5F). To bolster her reliance on the opinions of Drs. Popov and Heilpern on the issue of mental limitations, the Commissioner cites this court's decision in Davis v. Astrue, 2010 WL 1381004 (M.D. Ala. Mar. 31, 2010), adding a parenthetical explanation indicating that the court concluded that the "ALJ reasonably gave great weight to reviewing source opinion that was supported by and consistent with the record as a whole[.]" (Commissioner's brief, pp. 7-8). While the Commissioner's parenthetical explanation is accurate, the Commissioner fails to acknowledge that the reviewing source opinion on which the ALJ had relied in Davis to support his PRTF ratings and his conclusion that the claimant's depression was not a severe impairment was that of Ellen N. Eno, Ph.D., the non-examining agency expert who had

"assessed the record concerning plaintiff's *mental status*." Davis, 2010 WL 1381004 at *1, 5 (emphasis added). Davis does not support the position the Commissioner now advances. Additionally – and significantly – the ALJ in this case did not himself rely expressly on either Dr. Popov's or Dr. Heilpern's opinions in analyzing plaintiff's mental impairments and limitations. (See R. 24-25).

## CONCLUSION

In summary, the reasons stated by the ALJ for assigning "little weight" to Dr. Schuster's medical opinions do not constitute good cause for doing so, in view of the record as a whole. Additionally, the ALJ failed to consider all of the probative evidence relating to plaintiff's mental limitations. The ALJ's mental RFC findings – including his implicit conclusion that plaintiff remains capable of performing the mental demands of "simple 1-2 step" work on a sustained basis, despite his moderate difficulties in concentration, persistence, and pace – are not supported by substantial evidence of record. Accordingly, the Commissioner's decision is due to be reversed, with a remand for further administrative proceedings. A separate judgment will be entered.[11]

DONE, this 26th day of August, 2014.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[11] The court expresses no opinion regarding whether plaintiff is entitled to the benefits he seeks.